

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PETER SUNG OHR, REGIONAL DIRECTOR OF REGION 13 OF THE NATIONAL LABOR RELATIONS BOARD, for and on behalf of the National Labor Relations Board, <br><br> Petitioner, <br><br> v. <br><br> NEXEO SOLUTIONS, LLC, <br><br> Respondent. | Case No. 12 C 1226 <br><br> Judge John W. Darrah |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the petition for an injunction pursuant to Section 10(j) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, 29 U.S.C. § 160(j), brought by Petitioner Peter Sung Ohr, Regional Director of Region 13 of the National Labor Relations Board ("NLRB" or the "Board"), for and on behalf of NLRB. Petitioner seeks an injunction against Respondent, Nexeo Solutions, LLC ("Nexeo"), pending a charge that is currently before the Board. On May 2, 2012, the Court conducted a hearing on Petitioner's request for a Section 10(j) injunction, at which the Court heard testimony and took evidence.

### BACKGROUND[1]

On November 5, 2010, TPG Accolade LLC entered into a Purchase and Sale Agreement (the "Purchase Agreement") with Ashland, Inc. ("Ashland") to purchase its

---

[1] These findings rest on a review of the record and evidence presented during the injunction hearing.

assets. TPG Accolade LLC later changed its name to Nexeo Solutions, LLC. The transaction closed on March 31, 2011, and Nexeo commenced operations the next day. This included the Willow Springs Facility, located in Willow Springs, Illinois, which has warehouse and trucking operations.[2]

Local 705 represents approximately 32 drivers, employed at the Willow Springs Facility. The most recent collective-bargaining agreement was effective November 1, 2006, to October 31, 2010. Following the expiration of that contract, Local 705 and Ashland began negotiating a new labor contract.

Pursuant to the Purchase Agreement with Ashland, Nexeo agreed to offer at-will employment to Ashland employees. (General Counsel's Exhibits ("GC") 6 at 55.) At Section 5.18(c), "Labor Matters," the Purchase Agreement provides:

> With respect to the Employees, except for contracts listed in Schedule 5.18(c) (the "Union Contracts"), neither Ashland nor any Asset Selling Corporation is a party to or is bound by any union contract or collective bargaining agreement, nor, except as set forth in Schedule 5.18(c), to the Knowledge of Ashland, is any such contract or agreement currently in effect or being negotiated by or on behalf of Ashland or any Asset Selling Corporation and no employee consultation body exists representing Employees.

(*Id.* at 42.) Local 705 is listed on Schedule 5.18(c).

At Section 7.5(d), "Certain Employee Matters," the Purchase Agreement states:

> Continuation of Compensation and Benefits. For a period of eighteen (18) months immediately after the Closing Date (or for such longer period as required by applicable Law or pursuant to the terms of any applicable Union Contract),

---

[2] Ashland Distribution – the portion of Ashland that Nexeo purchased – has 57 owned or leased facilities, 62 third-party warehouses, rail terminals and tank terminals and three locations that perform contract packaging activities. (General Counsel's Exhibits ("GC") 10 at 3.)

2

> Buyer shall (or shall cause the Buyer Corporations to) provide to each Transferred Employee (i) a base salary or wages no less favorable than those provided immediately prior to the Closing Date and (ii) other employee benefits, variable pay, incentive or bonus opportunities under plans, programs and arrangements that are substantially comparable in the aggregate to those provided by Ashland or the applicable Asset Selling Corporation as expected to be in effect on January 1, 2011, as set forth on <u>Schedule 7.5(d)</u>. Notwithstanding the foregoing, nothing contemplated by this Agreement shall be construed as requiring either Buyer or any Buyer Corporation to be obligated to continue the employment of any Transferred Employee for any period after the applicable Closing Date.

(GC 6 at 57.)

As to "Union Contracts," at section 7.5(o), the Purchase Agreement provides:

> From and after the Closing, Buyer shall, and shall cause the Buyer Corporations to, comply with any applicable labor, employment and retirement Laws with respect to the Transferred Employees, and shall recognize any collective bargaining units representing the Transferred Employees that are recognized as of immediately prior to the Closing.

(*Id.* at 59.)

In January 2011, Nexeo retained John Hollinshead, a consultant, to oversee labor-relations matters, including responsibility for overseeing the preparation of offers of employment to union-represented employees of Ashland and communicating with the unions. In early February 2011, the offer letters were finalized and information meetings were set up with the eight unions that represented Ashland employees.

The offer letter prepared by Nexeo for Local 705 members provided the following:

> Ashland employment policies will terminate when the sale closes. To the extent reasonably possible under our structure, Nexeo Solutions' employment policies will

3

> generally mirror those policies. We are not, however, adopting any existing policies that are inconsistent with the express terms of our policies.
>
> \* \* \*
>
> As we discussed with your business agent earlier this week, before Nexeo Solutions can recognize the union as your representative . . . a majority of our employees in the unit in which you work come from the current Ashland bargaining unit. Accordingly, once we know that a majority of employees from the Ashland bargaining unit has accepted the offer, we will be able to immediately recognize the union as your representation.
>
> \* \* \*
>
> In extending this offer to you, we think you should know that Nexeo Solutions has not agreed to assume any of Ashland's collective bargaining agreements. We have also chosen not to adopt, as initial terms and conditions of employment, any of the provisions contained in any current or expired collective bargaining agreement to which Ashland is a party. Among other things, what this means is that if you accept this offer, you will not, when you become a Nexeo Solutions employee, participate in either the multi-employer pension plan or the multi-employer health and welfare plan in which you participate as an Ashland employee. Instead, you will be covered at the outset of your employment by Nexeo Solutions' 401(k) and group health plans.

(GC, Ex. 10 at 1-2.)

An informational meeting was held on February 15, 2011, with Local 705 employees. Hollinshead distributed a draft copy of the offer letter, reviewed its terms, and indicated that offer letters would be mailed to employees on February 17, 2011.

Nexeo mailed offer letters to Local 705 employees on February 17, 2011. In responding to the offers, some employees struck out language in the letter, reflecting their disagreement with the terms of Nexeo's offer. Hollinshead informed Local 705

4

representative, Neil Messino, and Messino requested that Nexeo provide clean copies of the offer letter to the employees. Nexeo sent clean letters and the employees signed and returned the offer letters to Nexeo prior to the transaction closing on March 31, 2011. Many of the employees wrote "under protest" next to their signatures.

Before closing, Nexeo extended conditional recognition to the eight unions that represented employees at Ashland.[3] Before closing, Nexeo reached a collective-bargaining agreement with six of the unions; Nexeo did not reach agreement with Local 705. Nexeo and Local 705 participated in two pre-closing negotiating sessions on March 23, 2011, and March 31, 2011. On March 28, 2011, Nexeo also participated in a conference call with Messino. The parties did not reach an agreement before closing. On April 1, 2011, Nexeo's terms outlined in its offer letter went into effect.

In its Complaint in the NLRB case, the General Counsel alleges that the following actions by Nexeo violated Sections 8(a)(1) and (5) of the NLRA: implementing Nexeo's 401(k) retirement plan, instead of making contributions to Local 705's Pension Plan; implementing Nexeo's healthcare plans, instead of making contributions to Local 705's Health & Welfare Plan; not guaranteeing employees' eight hours' pay each day and 40 hours' pay each week; implementing overtime policy in which workers would have to work over 40 hours' pay each week, instead of eight hours' pay each day, to receive overtime; providing that employees would receive 40 hours' pay for each week of vacation instead of 50 hours' pay.

---

[3] Ashland's employees were represented by eight different unions in New Jersey, California, Kentucky, Pennsylvania, Missouri, Ohio, and Illinois. (GC 10 at 87.)

## LEGAL STANDARD

Section 10(j) of the NLRA authorizes a district court to grant temporary injunctive relief pending the Board's final resolution of unfair labor practice proceedings if such relief would be "just and proper." 29 U.S.C. § 160(j). An injunction issued under the authority of Section 10(j) has been described as an "extraordinary remedy." *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1566 (7th Cir.1996) (*Electro-Voice*). "The court looks to the same factors to which it looks in other contexts when deciding whether to grant injunctive relief . . . ." *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 499-500 (7th Cir. 2008) (*Spurlino Materials*).

Thus, the petitioner will be entitled to interim relief when (1) the petitioner has a reasonable likelihood of prevailing on the merits of the complaint; (2) there is no adequate remedy at law; (3) "the labor effort would face irreparable harm without interim relief, and the prospect of that harm outweighs any harm posed to the employer by the proposed injunction"; and (4) public harm would occur in the absence of interim relief. *Id.* at 500 (quoting *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 286 (7th Cir. 2001) (*Bloedorn*)). The Director bears the burden of establishing the first, second and fourth of these circumstances by a preponderance of the evidence. *Id.*

## ANALYSIS

### *Likelihood of Success on the Merits*

In considering the moving party's "likelihood of success" in the Section 10(j) context, "it is not the district court's responsibility . . . to rule on the merits of the [NLRB's] complaint." *Bloedorn*, 276 F.3d at 287. "A federal court has no jurisdiction to pass on the merits of the underlying case before the [NLRB]." *Electro-Voice*, 83 F.3d at

6

1567. Instead, "deciding the merits of the case is the sole province of the [NLRB]." *Spurlino Materials*, 546 F.3d at 502.

Accordingly, the likelihood of success on the merits requires the court to "evaluate[ ] only on a preliminary basis the [Petitioner's] probability of success before the Board." *Bloedorn*, 276 F.3d at 287. Petitioner maintains that he has a likelihood of proving before the Board that Respondent has violated Sections 8(a)(1) and (5) of the NLRA by engaging in unfair labor practices. Petitioner specifically bases his argument on his contention that Nexeo is a "perfectly clear" successor under *NLRB v. Burns International Sec. Servs.*, 406 U.S. 272, 285 (1972) (*Burns*).

In *Burns*, the Supreme Court explained that, "'although successor employers may be bound to recognize and bargain with the union,' except in rare circumstances 'they are not bound by the substantive provisions of a collective-bargaining contract negotiated by their predecessors but not agreed to or assumed by them.'" *S&F Market Street Healthcare LLC v. NLRB*, 570 F.3d 354, 358 (D.C. Cir. 2009) (quoting *Burns*, 406 U.S. at 284). The Supreme Court identified an exception for "instances in which it is perfectly clear that the new employer plans to retain all of the employees in the [bargaining] unit." *Burns*, 406 U.S. at 294-95. Thus, while "a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor," a so-called "perfectly clear" successor must bargain with the employees' representative before it changes any terms to which its predecessor had agreed. *Id.*

In *Spruce Up Corp.*, 209 NLRB 194 (1974), *enf'd per curiam*, 529 F.2d (4th Cir. 1975) (*Spruce Up*), the Board addressed the circumstances under which the perfectly-clear-successor exception applies. In *Spruce Up*, the employer expressed a "general

willingness" to hire his predecessor's employees but also announced he was going to change their commission rates. The Board held that the employer "thereby made it clear from the outset that he intended to set his own initial terms, and that whether or not he would in fact retain the incumbent [employees] would depend upon their willingness to accept those terms." *Id.* at 195. In holding that the perfectly clear successor exception did not apply, the Board explained:

> [T]he caveat in *Burns* . . . should be restricted to circumstances in which the new employer has either actively or, by tacit inference, misled employees into believing they would all be retained without change in their wages, hours, or conditions of employment, or at least to circumstances where the new employer . . . has failed to clearly announce its intent to establish a new set of conditions prior to inviting former employees to accept employment.

Similarly, in *Ridgewell's, Inc.*, 334 NLRB 37 (2001), *enf'd* 38 Fed. Appx. 29 (D.C. Cir. 2002) (*Ridgewell's*), the successor employer said it would retain the predecessor's employees only as independent contractors. The Board held that the perfectly-clear-successor exception did not apply because the successor employer "portended employment under different terms and conditions" and thereby put the employees "on notice that a new set of employment conditions would be in effect." *Id.*

This case falls squarely in the *Spruce Up* and *Ridgewell's* camp. On February 17, 2011, Nexeo sent offer letters to Ashland's incumbent Local 705 employees that unambiguously stated Nexeo would change the conditions of their employment. Therefore, Nexeo is not a perfectly clear successor and was free to set the initial terms on which it wanted to hire Ashland's incumbent employees.

8

Petitioner argues that the terms of the Purchase Agreement render Nexeo a perfectly clear successor, specifically arguing that the Board has "recognized a successor's obligation to bargain before changing the existing terms and conditions, based on the terms of a contract with a third party." (Pet. Op. Br. at 6.) In support, Petitioner cites the ALJ's decision in *Springfield Transit Management*, 281 NLRB 72 (1986) (*Springfield Transit*), and the Board's decision in *The Denham Co.*, 218 NLRB 30 (1975) and 206 NLRB 659 (1973) (*Denham*). Neither case is persuasive.

In *Springfield Transit*, the Board affirmed the ALJ's finding that the successor employer was obligated to hire its predecessor's employees and maintain the terms and conditions of employment. *Springfield Transit*, 281 NLRB at 78. However, in that case, the relationship between the successor and predecessor was governed by the Urban Mass Transportation Act ("UMTA"), which required the successor to assume a predecessor's labor agreements. *See id.* at 73 (citing 49 U.S.C. § 1609(c)). Reflecting the requirements of the UMTA, the purchase agreement required the successor to "assume all labor and other employee contractual obligations, including but not limited to, collective bargaining agreements" of the predecessor. *Id.* at 78. By contrast, here, the Purchase Agreement expressly provided that Nexeo was not adopting or assuming Ashland's labor agreements. (GC 6 at 19.)

In *Denham*, Petitioner explains that the Board found a perfectly clear successor relationship based "in large part" on the successor employer's agreement with the predecessor to retain its employees for 30 days." (Pet. Op. Br. at 6.) The use by Petitioner of the phrase "large part" is notable. In *Denham*, the Board did not hold that a purchase agreement, *alone*, can make a purchaser a perfectly clear successor. Rather, the

9

Board based its decision on several points, one of which was the successor's decision to retain the incumbent employees for 30 days. In the Board's original decision, the Board noted that the successor distributed a leaflet to employees on the same day it took over the predecessor's business and only informed the employees of changes in the terms and conditions of their employment after it acquired the business. *The Denham Co*, 187 NLRB 434, 439. By contrast here, Nexeo advised Local 705 employees of the changes in the employment terms and sent offer letters, detailing those terms before the close date.

Petitioner has failed to prove by a preponderance of the evidence that he has a high likelihood of proving that Nexeo engaged in unfair labor practices. In this case, the timing and nature of Nexeo's unambiguous pre-hire communications with Ashland's Local 705 employees is compelling towards a finding that Petitioner does not have a likelihood of success on the merits of its Complaint before the NLRB.

*Irreparable Harm/Adequate Remedy at Law*

The purpose of Section 10(j) is to prevent employers from taking advantage of the "extraordinarily slow" NLRB resolution process to quash union support in the interim. *Spurlino Materials*, 546 F.3d at 502. "A court should evaluate the equities through the prism of the underlying purpose of § 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge." *Lineback v. Printpack, Inc.*, 979 F. Supp. 831, 847 (S.D. Ind. 1997) (internal quotation and citation omitted).

In assessing the propriety of injunctive relief, consideration must be given to the collective bargaining rights of the employees and what belated relief may mean to the future exercise of those rights. *Bloedorn*, 276 F.3d at 297. The Court must consider

whether, in the absence of the requested injunctive relief, the collective-bargaining and organizing rights of the employees will be irreparably undermined. *Id.*

Petitioner argues that Nexeo's implementation of the initial employment terms has undermined the collective-bargaining process and employee support for the union. Petitioner argues, pointing to drivers' testimony from the hearing, that drivers view the union as powerless to aid them, usually no more than two drivers show up for the union meetings, and about one-fourth of the drivers are delinquent for the first time ever in paying their union dues. (Pet. Reply Br. at 9.)

The dispositive consideration here is whether in the absence of the requested injunctive relief, the collective bargaining and organizing rights of the employees will be irreparably undermined. *Bloedorn*, 276 F.3d at 297. There is a notable difference between this case and cases in which courts have held that the petitioner satisfied the irreparable harm prong. In this case, Nexeo recognized the Local 705 as soon as the employees returned signed, unmarked copies of their offer letter. Further, Nexeo held three pre-closing and one post-closing collective-bargaining session with Local 705. By contrast, for example, in *Barker v. A.D. Conner Inc.*, 807 F. Supp. 2d 707, 728 (N.D. Ill. 2011), the successor employees refused to recognize the union's representation of 16 employees, "thereby stripping those employees of their collective bargaining rights."

Petitioner argues that the parties have not engaged in a bargaining session since they last met on June 1, 2011, and no Nexeo representative has testified that Nexeo is willing to resume negotiations. But on that same note, Petitioner has presented no testimony that Local 705 has made any efforts to resume the negotiation process with Nexeo. To the contrary, in his testimony, Local 705 representative Messino agreed that

11

Local 705 has not scheduled any bargaining sessions for almost a year because he felt that Nexeo's implementation of the initial employment terms put the union at a disadvantage and, from the union's perspective, any bargaining would be futile unless the company was ordered to restore the terms of the expired CBA. (Tr. at 115.) Messino agreed that suspending bargaining sessions was a "judgment call" and that filing a charge against Nexeo before the NLRB did not suspend a duty to bargain. (*Id.*)

This case markedly differs from those in which successive employers have refused to recognize the union, thereby eviscerating the bargaining unit. In the instant case, there is no irreparable harm that cannot be adequately remedied by a Board decision.

### *Public Interest*

Finally, Petitioner has failed to show by a preponderance of the evidence that the public interest would be harmed in the absence of an injunction. Courts weigh the benefits and costs to the public stemming from the grant or denial of injunctive relief. *See Electro-Voice,* 83 F.3d at 1574. Petitioner makes the conclusory argument that there is a substantial public interest in facilitating the collective-bargaining process. But like the demonstration of irreparable harm, Petitioner has not demonstrated why this case will damage the public interest if the injunction does not issue.

## CONCLUSION

For the reasons set forth above, Petitioner's Petition for Preliminary Injunction Under Section 10(j) of the National Labor Relations Act [1] is denied.

Date: 6/28/12

JOHN W. DARRAH
United States District Court Judge